**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GROCERY OUTLET INC., | |
| Plaintiff, | No. C 06-02173 JSW |
| v. | |
| ALBERTSONS, INC., AMERICAN STORES COMPANY, LLC, and LUCKY STORES, INC., | **AMENDED ORDER GRANTING ALBERTSONS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

Now before the Court is the motion for summary judgment filed by Defendants American Stores Company, LLC, New Albertsons, Inc., and Albertson's LLC, (collectively "Albertsons"). The Court finds that this matter is appropriate for disposition without oral argument and it is hereby deemed submitted. *See* Civ. L.R. 7-1(b). Accordingly, the hearing set for December 12, 2008 is HEREBY VACATED. Having considered the parties pleadings, the relevant legal authority, the Court hereby GRANTS Albertsons' motion for summary judgment.[1]

**BACKGROUND**

Defendant Albertsons owns the rights to the trademark Lucky on grocery stores. Plaintiff, Grocery Outlet Inc. ("Grocery Outlet"), contends that it has the right to open a number of grocery outlets by the name Lucky because Albertsons has abandoned the mark.

---

[1] The motion by the Albertsons' defendants is joined by defendant Save Mart Supermarkets. The joinder is HEREBY GRANTED and summary judgment shall be entered for all current defendants.

1 Abandonment of the mark requires both that the trademark owner has ceased to use the mark
2 and that it has done so with an intent not to resume.

3 Albertsons moved for a preliminary injunction to halt the efforts of Grocery Outlet to
4 continue to utilize the mark in their grocery services and products, and, on July 7, 2006, this
5 Court issued a preliminary injunction. In granting the motion, the Court found that Albertsons
6 was likely to succeed on the merits of its claim and that there was a possibility of irreparable
7 injury. The Court found that although there was some evidence of use after the change of the
8 name of the Lucky stores to adopt the Albertsons' name, it was merely in the sell-off of existing
9 inventory. The Court concluded on that basis that there was a cessation of bona fide
10 commercial use. However, the Court did find that there was sufficient evidence in the record to
11 demonstrate that Albertsons was likely to prevail on the issue of intent not to resume. That is,
12 the Court held that, although it found there was a cessation of use, Albertsons had offered
13 sufficient evidence of its intent to resume use of the Lucky mark within the reasonably
14 foreseeable future during the period of alleged nonuse. On appeal, the Ninth Circuit affirmed
15 this Court's preliminary injunction order on the same basis. *See Grocery Outlet Inc. v.*
16 *Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).

17 Now, Albertsons brings this motion for summary judgment on the basis both that the
18 law has changed, rendering the sell-off of inventory to comprise bona fide commercial use, and
19 on the basis that the undisputed facts in the record indicate that Albertsons intended to resume
20 use of the mark within the relatively short period of nonuse. Grocery Outlet continues to
21 maintain that Albertsons has abandoned the Lucky mark and that there exist disputes regarding
22 material issues of fact precluding summary judgment.

23 The Court sets out briefly the relevant factual history.

24 **A.   Trademark Registrations and Albertsons Acquisition.**

25 The Lucky mark is the subject of approximately sixteen federal trademark registrations
26 covering a variety of grocery products and supermarket and grocery store services, including
27 U.S. Registration 1,543,066, which was registered on June 6, 1989, and has now become
28 "incontestable." (Order dated July 7, 2006 ("Order") at 2.)

2

The Lucky mark is the subject of several California and Nevada state registrations, including California Trademark Renewal Registration No. 05255 for the Lucky mark for retail grocery services, granted on November 27, 1967, based upon first use in October, 1935. (*Id.*)

In 1988, Lucky Stores, Inc. was acquired by American Stores Company, Inc. The Lucky stores at that time continued to operate under the Lucky banner, and continued to sell Lucky-brand private label goods.

In 1998, Albertsons entered into a merger agreement with American Stores. The acquisition closed in June 1999. By November 1999, the former Lucky stores were converted to "Albertsons" stores. (Declaration of Gary D. Michael ("Michael Decl."), ¶¶ 6-10.)

Following the merger, Albertsons decided to rebrand all of the existing Lucky stores with the Albertsons name. (*Id.*, ¶¶ 6-7.) However, before the decision was made to rebrand the stores, Albertsons management was already discussing use of the Lucky mark on different format grocery stores. (*Id.*, ¶¶ 8-10.) To publicize the merger, Albertsons developed a "Wedding of the Century" theme for its advertising campaign, indicating that the two stores were being combined into one, with the new name of Albertsons. (Declaration of Peter W. Craigie ("Craigie Decl."), ¶¶ 5-7, Exs. D-F.) Although Albertsons never unequivocally announced that it would never again use the Lucky mark, it was clear that the new brand name under the merger for the store and its products was to be Albertsons. (Michael Decl., ¶ 9.)

**B.     Evidence of Post-Conversion Use by Albertsons.**

After the name change, Albertsons continued to sell Lucky brand private label merchandise in their stores for several years after the conversion from existing inventory, including newly-manufactured products to fill remaining Lucky labels and packaging. (*See* Order at 2-3, with record cites.) The Albertsons stores sold more than 72 million units of Lucky-branded items in 2002; they sold an excess of 290,000 units in 2001; 45,000 units in 2002. Sales continued to decline, with sale in 2003 of 39 units, 1 item in 2004, and 13 items sold in 2005. (Declaration of Mark Tate in support of Motion for PI, ¶¶ 3-9, Exs. A-C; Declaration of Mark Tate in reply for Motion for PI, ¶ 7; and Declaration of Dennis Clark in support of Motion for PI, ¶¶ 2-3, Ex. A.)

Also, apparently at the request of counsel, during the period from conversion to the present, Albertsons created a few signs with the Lucky mark in connection with the renewal of their trademark registrations. (Declaration of John A. Chatowski in support of Motion for PI ("Chatowski Decl."), Ex. C (deposition of Jeff Weidauer) at 21:21-23:22; 31:17-33:7; 38:8-20.)

After the store conversion, Albertsons maintained registration of the luckystores.com domain name which redirects to the Albertsons.com web site. Albertsons has also made general efforts to police the Lucky mark. (*Id.*, Ex. HH.)

**C.   Evidence of Albertsons' Intent to Resume Use.**

From early April 2001 when Albertsons hired Larry Johnston as the company's new CEO, there were discussions to resume use of the Lucky mark. (Declaration of Pamela Powell in support of Motion for PI ("Powell Decl."), ¶ 5; Declaration of Peter W. Craigie in opposition to Motion for PI ("Craigie Opp. Decl."), Ex. M (Romeo Cefalo deposition) at 73:4-74:25, 90:14-91:9; Declaration of Donna Robbins in support of opposition to Cross-Motion for PI ("Robbins Decl."), ¶ 4; Declaration of Romeo Cefalo in support of Motion for PI ("Cefalo Decl."), ¶ 10.)

In 2001, Albertsons commissioned Leo J. Shapiro & Associates to conduct research to determine residual goodwill in the Lucky mark and to track shopping behavior. (Cefalo Decl., ¶ 11, Exs. A, B.) Albertsons then commissioned ad agency Duncan & Associates to assemble focus groups to determine why they had lost Lucky customers as a result of the name change. (Powell Decl., ¶ 4, Ex. A.)

A June 4, 2001 study indicated that there was a great degree of customer loyalty to the Lucky name and proposed the possibility of using the Lucky name for a cost-related program. (Declaration of Philip Johnson: Lucky Brand Equity Study, Ex. B at 7-8.)

In December 2001, Donna Robbins of the Albertsons California Division was directed by CEO Johnston to examine the possibility of using the Lucky mark in a new line of stores targeted at specific ethnic markets. (Robbins Decl., ¶¶ 3-4.) In conjunction with this effort, Albertsons hired the Cultural Access Group to conduct a brand equity study to assist

Albertsons in deciding between use of the Lucky name and the SuperSaver name in primarily Hispanic neighborhoods. (Powell Decl., ¶ 6, Ex. B.) Albertsons chose to use the name SuperSaver. (Powell Decl., ¶ 6, Ex. B.)

Plans to begin work on bringing back the Lucky mark began again in earnest in 2004. Albertsons prepared a series of presentations in conjunction with Extreme, Inc. evidencing plans to convert non-performing Albertsons' stores into warehouse-type price-impact stores in predominantly Hispanic neighborhoods in California, using the Lucky banner. (Cefalo Decl., ¶¶ 19-22, 24-26, Exs. C, E-H; Declaration of Jim Vaughan in opposition to Cross-Motion for PI, ¶ 3, Exs. B, C; Declaration of Mike Clawson in opposition to Cross-Motion for PI ("Clawson Decl."), ¶ 4, Ex. A at ALB01210, Ex. B at ALB01153, Ex. C at ALB01170, Ex. D at ALB01282, Ex. F at ALB01259.)

In March 2004, Albertsons created a business plan which included the proposed opening of California stores under the Lucky banner. (Cefalo Decl., ¶¶ 22-24, Ex. C, Clawson Decl., ¶ 4, Ex. E.) Starting in mid-2005 and continuing well into 2006, employees at Albertsons were specifically tasked with the plan to convert a number of stores to the Lucky banner in ethnic format in primarily Hispanic neighborhoods. (Craigie Opp. Decl., Ex. T (Van Helden deposition) at 55:19-25; Declaration of Peter Van Helden in support of Motion for PI ("Van Helden Decl."), ¶ 7; Declaration of John G. Harb in support of opposition to Cross-Motion for PI ("Harb Opp. Decl."), ¶¶ 4-5, Exs. A, B.)

Plans to convert the first five stores under the Lucky banner – three in California (Alhambra, El Centro and San Ysidro) and two in Nevada (Las Vegas) – indicated that the stores were set to open on May 24, 2006. (Van Helden Decl., ¶ 11; Declaration of Peter Van Helden in support of opposition to Grocery Outlet's motion, ¶ 3; Harb Opp. Decl., Ex. B.)

**D.  Evidence of Intervening Factors Which Caused Delay and Ongoing Efforts.**

Efforts in earlier years to rebrand or resume use of the Lucky name were halted by the grocery industry strike which lasted from October 2003 through February 2004 and consumed huge amounts of Albertsons' time and resources. (Powell Decl., ¶¶ 7-8; Cefalo Decl., ¶¶ 15-

5

18.)  Again, in 2005, plans to open California stores under the Lucky banner were delayed as a result of discussions to sell the Albertsons company.  (Cefalo Decl., ¶ 28.)

However, since the time of the Court's decision on the preliminary injunction, Albertsons has begun operating and rebranding many stores under the Lucky name, in both California and Nevada.  (Declaration of Dennis Bassler, ¶ 7; Declaration of Justin Dye, ¶ 12.)

**E.     Grocery Outlet's Use.**

Grocery Outlet, an extreme value grocer operating in California, on January 23, 2006, filed with the U.S. Patent and Trademark Office an intent to use application, Serial No. 78/797,105 for the Lucky mark for "Retail grocery store services; discount grocery store services; and extreme value grocery store services."  (Declaration of Bob Tiernan in support of Cross-Motion for PI, ¶ 6.)

On April 1, 2006, Grocery Outlet opened its first grocery store under the Lucky mark. (*Id.*, ¶ 2.)  Grocery Outlet intends to open further stores under the Lucky mark and to continue to sell Lucky-branded private labels.  (Chatowski Decl., Ex. T (Jonathan Kirk Wylie deposition) at 302:12-21; Tiernan Opp. Decl., ¶ 9.)

The Court will address additional specific facts as required in the analysis.

## ANALYSIS

**A.     Standards Applicable to Motions for Summary Judgment.**

A court may grant summary judgment as to all or a part of a party's claims.  Fed. R. Civ. P. 56(a).  Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  *Id*. at 248.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light

6

most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.   Law of Abandonment.**

Grocery Outlet maintains that although Albertsons is the registered trademark holder for the Lucky mark, because of its nonuse of the mark, Albertsons has abandoned the Lucky trademark. Every one of Grocery Outlet's claims rests upon the premise that Albertson's abandoned the Lucky mark and therefore retain no rights to it. The essential issue, therefore, before the Court is whether there exists a dispute of material fact that the contention of abandonment may prevail. Although the issue of whether a trademark has been abandoned is generally a fact-intensive one resolved by the jury, courts have granted summary judgment on abandonment where the holder of the mark ceases to use it, but for less than three years, and the party asserting abandonment cannot establish that the markholder intended not to resume use during the nonuse period or where there has been a cessation of use for three or more consecutive years, but the undisputed facts rebut the presumption of abandonment.

To bring a trademark infringement action under the Lanham Act, a plaintiff must hold a valid trademark. Under the Lanham Act, a trademark is deemed abandoned, and thus no longer valid, "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127; *see also Cumulus Media, Inc. v. Clear Channel Comm., Inc*., 304 F.3d 1167, 1173 (11th Cir. 2002) ("[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff."); *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1022-23 (11th Cir. 1989) (per curiam) ("Trademark ownership is always appurtenant to commercial activity. Thus, actual and continuous use is required to acquire and retain a protectible interest in a mark.") "Abandonment is trademark law's way of recognizing that trademark rights flow from use." *Cumulus Media*, 304 F.3d at 1173 (internal citations omitted).

If a mark holder stops using a mark with an intent not to resume its use, the mark is deemed abandoned and "falls into the public domain and is free for all to use ... Abandonment paves the way for future possession and property in any other person." 3 *McCarthy on Trademarks and Unfair Competition* § 17:1 (4th ed. 2008). When a mark is abandoned, it returns to the public domain and thus, a party who successfully shows that a trademark owner has abandoned a mark is free to use the mark without liability. *Cumulus Media*, 304 F.3d at 1173.

The Lanham Act provides that "a mark shall be deemed to be 'abandoned' ...

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.

This section requires that a putative trademark infringer prove both of two separate elements: that the trademark owner has ceased using the mark in dispute, and that it has done so with an intent not to resume its use. *Prudential Ins. Co. of America v. Gibraltar Financial Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982) (citing *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043-44 (2d Cir. 1980)).

8

Because proving the subjective intent of a trademark holder is burdensome, the Lanham Act provides both that "[i]ntent may be inferred from the circumstances" and it allows a showing of three years of consecutive nonuse to create a rebuttable presumption of intent not to resume use by stating that "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127.

Abandonment of a trademark must be strictly proven. *Unuson Corp. v. Built Entertainment Group, Inc.*, 2006 WL 194052, at *4 (N.D. Cal. Jan. 23, 2006) (citations omitted). "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict' burden of proof." *Cumulus Media,* 304 F.3d 1175. While the Ninth Circuit has still not defined the "strictly proved" standard further, the majority of courts applying that standard have found that evidence of abandonment must be clear and convincing. *See Grocery Outlet*, 497 F.3d at 951 (finding that the court "need not resolve the burden of proof issue."); *see also Cash Processing Services v. Ambient Entertainment, Inc*., 418 F. Supp. 2d 1227, 1232 (D. Nev. 2006) (citing *EH Yacht LLC v. Egg Harbor, LLC,* 84 F. Supp. 2d 556, 564 (D.N.J. 2000) (citing McCarthy at § 17:12); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F. Supp. 1339, 1355 (E.D.N.Y. 1994)). It is *not* the law that 'the slightest cessation of use causes a trademark to roll free, like a fumbled football, so that it may be pounced on by any alert opponent.'" *McCarthy on Trademarks* § 17:14 (citing *Continental Distilling Corp. v. Old Charter Distillery Co.*, 188 F.2d 614, 619 (D.C. Cir. 1950)). Because the Court finds that there was continued use through 2005 and there is undisputed evidence in the record indicating Albertsons' intent to resume use within the relevant time period, the Court finds that summary judgment is appropriate under either the clear and convincing standard of proof or the preponderance of the evidence standard. Therefore, this Court need not decide the issue of what standard of proof is appropriate.

9

### 1. Use During Relevant Time Period.

Albertsons' use of the mark from the time of its conversion in November 1999 through the present time has been somewhat limited. Albertsons made a concerted effort to remove the vestiges of the old Lucky mark when it converted the Lucky stores to the Albertsons brand.

However, there is evidence in the record that Albertsons continued to sell off inventory with the Lucky label after the conversion. The evidence demonstrates that Albertsons continued to sell Lucky private label products after the conversion. (Declaration of Mark Tate in support of Motion for PI, ¶¶ 3-9, Exs. A-C; Declaration of Mark Tate in reply for Motion for PI, ¶ 7; and Declaration of Dennis Clark in support of Motion for PI, ¶¶ 2-3, Ex. A.) Considering the number of products dropped precipitously over the years following the 1999 conversion, the Court deduces that the sales merely marked the sell off of residual inventory, either existing product or new manufacture of product to fill pre-existing remaining labels and packaging. There is also evidence in the record, however, that, following the rebranding efforts, Albertsons ran advertisements for the Lucky-branded products and engaged in efforts to promote the products through, for instance, special store displays. (*See* Declaration of Carl W. Pennington, ¶ 12.)

There is also evidence in the record demonstrating that Albertsons created signage with the Lucky mark on a few stores after the conversion. However, the evidence is persuasive that such signage was erected solely on the advice of counsel for the purpose of maintaining an active registration in the mark. Such usage is not considered active use in the ordinary course of trade. *See, e.g., Intrawest Fin. Corp. v. Western Nat'l Bank of Denver*, 610 F. Supp. 950, 958 (D. Colo. 1985); *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 101 (5th Cir. 1982).

Since the time this Court issued its order granting Albertsons' preliminary injunction motion the Ninth Circuit has held that "the meaning of 'use' for the purposes of abandonment necessarily signifies 'use in commerce' and thus includes the placement of a mark on goods sold or transported." *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 936 (9th Cir. 2006) (citing *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 676 (7th Cir.

1982)). The court specifically rejected the argument that "attempts to merely 'rid oneself of inventory,' were not bona fide uses in the ordinary course of trade." *Id.* at 937. "Abandonment requires *complete* cessation or discontinuance of trademark use." *Electro Source*, 458 F.3d at 938. "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Id.* at 940 (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970)). "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Id.* (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970)).

In *Electro Source*, decided after this Court's ruling on the motion for preliminary injunction, the Ninth Circuit specifically rejected the contention that sell off of inventory does not amount to bona fide commercial use under there standards. *Id.* at 936-37. The court held that even for a business that is "on its way out, [i]f there is continued use, a prospective intent to abandon the mark or business does not decide the issue of abandonment." *Id.* at 937. Abandonment requires the "*complete* cessation or discontinuance of trademark use." *Id.* at 938 (emphasis in original) (citing 15 U.S.C. § 1127; *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3rd Cir. 2006)).

Therefore, this Court's earlier ruling that what it deduced from the evidence as sell off of residual inventory not constituting bona fide use of a trademark can no longer hold. (*See* Order at 7-8 (finding that the sell-off of existing inventory does not constitute use in the ordinary course of commerce and does not therefore qualify as bona fide use of a trademark in the context of 15 U.S.C. § 1127, citing *Unuson*, 2006 WL 194052, at *4 (finding that use of the mark in the distribution of leftover concert memorabilia to fans was insufficient use of the mark in the ordinary course of trade); *see also Anvil Brand, Inc. v. Consol. Foods Corp.*, 464 F. Supp. 474, 481 (S.D.N.Y 1978) (holding that depleting label inventory of discontinued brand does not qualify as trademark use); *but see Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1571 (Fed. Cir. 1990) (finding that intermittent sales of inventory does not necessarily imply abandonment).) Because binding precedent on the definition of use has changed, the Court

1  finds that the same evidence proffered in July 2006 demonstrating the sell off of inventory of
2  Lucky products constitutes bona fide commercial use.  Therefore, there is uncontested
3  evidence in the record demonstrating that Albertsons continued to use the Lucky mark through
4  2005.[2]

### 2. Intent to Resume Use During Relevant Period.

A concrete "intent to use" is required. *Unuson Corp.*, 2006 WL 194052, *6 (citing *Imperial Tobacco Ltd. v. Philip*, 899 F.2d 1575, 1581 (Fed. Cir. 1990)); *Exxon Corp.*, 695 F.2d at 102-03.  "To overcome the presumption arising from lack of use, '[t]he registrant must put forth evidence with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred.'" *Id.*

The issue of intent to resume use only arises at the point of cessation of use. *See Electro Source*, 458 F.3d at 937-38 (holding that "unless the trademark use is actually terminated, the intent not to resume use prong of abandonment does not come into play.")  In addition, the Lanham Act directs that intent not to resume use may be inferred from the circumstances.  *Id.*  However, "[s]uch an intent cannot be far-flung or indefinite; rather there must be an intent 'to resume use within the reasonably foreseeable future.'" *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1529 (11th Cir. 2008) (citing *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989)).

The Court has already found that Albertsons' uncontroverted evidence of intent to resume use within the reasonably foreseeable future and within the relevant time period. (*See*

---

[2] Grocery Outlet's argument that the distinction between services and products compels the opposite conclusion is unpersuasive.  Where, as here, the goods and services are so closely related, the use of one is sufficient to maintain rights in the other.  The intentional advertising of the Lucky-branded goods were clearly designed for customers to associate the brand with the former Lucky-branded stores and to encourage the continued association in consumers. *See* 3 McCarthy on Trademarks and Unfair Competition, § 17:23 at 17-44.2 (4th ed. 2008) ("[T]here is no abandonment or break in the chain of priority of use merely because use of the mark is shifted from one line of goods or services to another similar line. Even when it is the user's clear intention to cease sales of closely related goods under the mark, continuance or commencement of sales of closely related goods under the mark is not abandonment of the mark and the earlier use may be relied upon for priority purposes.  The proper criterion is whether the buying public is likely to think that the new line of goods comes from the same source as the old line of goods.")

12

1  Order at 3-4.) There is evidence in the record demonstrating that Albertsons had an intent to
2  resume use of the Lucky mark as far back as 2001. There is also sufficient evidence indicating
3  valid reasons for delay in the implementation of those plans. The evidence establishes that
4  Albertsons intended to resume use of the name Lucky within the "reasonably foreseeable
5  future." *See Exxon Corp. v. Humble Exploration Co.*, 592 F. Supp. 1226, 1227 (D. Tex. 1984);
6  *see also Silverman v. CBS, Inc.*, 870 F.2d 40, 46 (2d Cir. 1989) (holding that abandonment can
7  be found once use has been discontinued "with an intent not to resume within the reasonably
8  foreseeable future.") There is no evidence that at the time of conversion, Albertsons
9  affirmatively announced its intention formally to abandon the mark for use in the grocery
10 business. *But cf. California Cedar Products Co. and Duraflame v. Pine Mountain Corp.*, 724
11 F.2d 827, 831 (9th Cir. 1984) (finding the trial court did not abuse its discretion in finding
12 abandonment effective as of date company affirmatively announced formal abandonment of
13 mark by alerting the newspaper and by filing documents in the United States Patent and
14 Trademark Office indicating express intention to abandon its registered trademark).

15 There is sufficient evidence in the record to establish that Albertsons did not act with an
16 intent not to resume use after the 2005 sales of inventoried Lucky-branded items. There is
17 undisputed evidence that Albertsons intended to resume use of the LUCKY mark on grocery
18 stores both before and after the conversion. There were internal discussions of using the
19 Lucky mark on Hispanic-themed neighborhood store or a box-type "price impact" store. (*See*
20 Michael Decl., ¶ 10.) There were significant discussions about rebranding such stores with a
21 Lucky brand storefront as early as 2001. (*See, e.g.,* Robbins Decl., ¶¶ 3-4; Powell Decl., ¶¶ 3-
22 4; Declaration of Larry Johnston, ¶¶ 1-4.) In 2004, Albertsons' executive vice president
23 decided to convert existing non-performing Albertsons' stores to warehouse-type, "price
24 impact" stores, and planned to use the Lucky banner on the converted stores in California.
25 (Cefalo Decl., ¶¶ 20-21; Clawson Opp. Decl., ¶ 3; Declaration of Jim Vaughan in support of
26 opposition to Cross-Motion for PI, ¶ 3.) There is sufficient, undisputed and contemporaneous
27 evidence indicating that Albertsons intended to resume use of the name prior to the last bona
28 fide commercial uses in 2005. Therefore, the Court finds that Albertsons has not abandoned its

13

rights to use of the Lucky trademark and summary judgment is therefore appropriate on all causes of action. Also, because Grocery Outlet is unable to demonstrate that Albertsons abandoned the Lucky mark, it has by its own admission, infringed Albertsons' trademark rights.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Albertsons' motion for summary judgment. A separate judgment shall issue and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: December 17, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE